UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WOLVERINE WORLD WIDE, INC., and
HUSH PUPPIES CANADA FOOTWEAR, LTD.,
             Plaintiffs,

                                        No. 1:07-cv-391
-v-
                                        HONORABLE PAUL L. MALONEY
WOLVERINE CANADA, INC.,
RICHARD HUNT, MIKE DYON, and
PAUL DYON
             Defendants.


OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

AND

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

        This matter comes before the Court on cross motions for summary judgment.  Defendants

Wolverine Canada, Richard Hunt, Mike Dyon and Paul Dyon (Defendants) filed a motion (Dkt. No.

90) for summary judgment.  Plaintiffs Wolverine World Wide and Hush Puppies Canada Footwear

(Plaintiffs) filed a motion (Dkt. No. 91) for partial summary judgment.  Plaintiffs and Defendants

filed responses to the cross motions.  (Dkt. Nos. 98 and 99.)  Plaintiffs and Defendants filed replies

to the responses.  (Dkt. Nos. 101 and 102.)  Plaintiffs filed a motion (Dkt. No. 103) for leave to file

a sur-reply.[1]  The Court has read the motions, briefs, supporting documents and relevant legal

---

[1] Defendants have asserted Plaintiffs' response and reply briefs were not timely filed.  Plaintiffs admit
their response was filed 31 days after service of Defendants' motion and their reply was filed 17 days
after service of Defendants' response.  Plaintiffs assert their briefs were timely because Defendants'
briefs, which started the clock, were electronically filed.  Under Fed. R. Civ. P.6(d) and Local Rule
5.7(i)(v), when a motion is filed electronically, the opposing party has an additional three days to file

authority.  Oral argument is not necessary to resolve the contested issues.  *See* W.D. MICH. L. CIV.

R. 7.2(d).

## I.  FACTUAL BACKGROUND

This dispute arises from several contracts between Plaintiffs and Defendants.  In 1994, Defendant Wolverine Canada (WCI) entered into a distribution agreement with Plaintiff Wolverine World Wide (Wolverine).[2]  (Plaintiffs' Brief in Support - Exhibit 4 - Distribution Agreement.) Through the distribution agreement, Wolverine granted WCI the "exclusive right . . . to sell Products to Retailers located in the Territory on terms and subject to the conditions set forth in this Agreement."  (*Id.* § 2.)  The distribution agreement specified that WCI "shall purchase all Products from one or more Authorized Manufacturers as provided in Section 8 of this Agreement."  (*Id.* § 2.1.) WCI sent Wolverine all purchase orders for approval, but WCI "purchase[d] all Products directly from an Authorized Manufacturer" and "each purchase order shall be made out to an Authorized Manufacturer."  (*Id.* § 8.2.)  WCI agreed to purchases minimum quantities of products for each year of the distribution agreement.  (*Id.* § 9.)

In 2003 and 2004, under the distribution agreement, WCI began purchasing and selling a steel-toed work boot known as Confines.  (*See* Defendants' Brief in Support - Exhibit 13 -  Robinson

<hr />

their response or reply brief.  *See Love v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 893, 895-896 (W.D. Mich. 2009) (Maloney, C.J.).  Plaintiffs' motion (Dkt. No. 103) for leave to file sur-reply is **GRANTED.**  For the reasons provided here, Plaintiffs' response and reply brief were timely filed.

[2]

Wolverine and WCI executed an amendment on January 1, 1998 extending the distribution agreement through December 31, 2002.  (Defendants' Brief in Support - Exhibit 1 - Amendment to Distribution Agreement.)  The two parties executed a second amendment on July 23, 2001 extending the distribution agreement through December 31, 2004.  (*Id.* - Amendment Number 2 to Distribution Agreement.)  The parties have not argued the amendments impact the outcome of the motions.

Dep. at 25.[3])  The boots were manufactured by Golden Chang.  (Defendants' Brief in Support - Hunt Dec. ¶ 10.)  Unfortunately, the Confines boots were defective because the steel toe rubbed against stitching and caused the stitching to break.  (*See* Defendants' Brief in Support - Paikin Dep. at 45.) (*See also* Plaintiffs' Brief in Support - Robinson Dep. at 31.)  Ultimately, three adjustments were made to the boots.  (*Id.* at 77.)  (*See* Hunt Dec. ¶ 15.)

Near the end of the effective term of the distribution agreement, Wolverine and WCI decided to end their relationship and they negotiated and executed a Termination and Asset Purchase Agreement (TAP).  (Plaintiffs' Brief in Support - Exhibit 2 - TAP.)  The parties anticipated WCI would continue to have business obligations beyond January 4, 2005, the date of the closing on the TAP (*see Id.* § 3.)  Accordingly, the parties negotiated how to handle those obligations and attempted to set forth in the TAP how those obligations would be met.

Various disagreements arose between the parties related to the termination of their relationship.  Plaintiffs filed a complaint in the Kent County Circuit Court in Michigan.  Defendants removed the action to federal court.  Eventually, Defendants filed a second amended answer with

---

[3] The depositions submitted as exhibits by the parties take two forms.  Some of the depositions, like Defendants' version of Mr. Robinson's deposition, are in a familiar transcript form with a box around the text, line numbers to the side of the text, and the name of the transcription service below the box at the bottom of the page.  The page numbers generated by the transcription service are located in the upper right corner of the box.  Other depositions are submitted in a form generated by a word processing program and lack the box around the text.  (*See e.g.,* Plaintiffs' Response - Exhibit 3 - Robinson Dep.)  In the form created by the word processing program, more than one page of text created by the transcription service may appear on each sheet of paper.  In this form, there are frequently multiple page numbers on a single sheet of paper, one at the bottom of the page created by the word processing program and one or more than one on the right side of the page representing the page numbers generated in the document created by the transcription service.  In order to avoid confusion, all deposition page numbers referenced here refer to the page numbers created by the transcription service rather than by the word processing program.

counter-claims. (Dkt. No. 79 - Answer and Counter-Claims.) Defendants counter-claims include breach of the distribution agreement and breach of the TAP.

## II. LEGAL STANDARD

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 574. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

This action comes to federal court on the basis of diversity of parties, after Defendants removed the action from state court. In diversity suits, federal courts apply the substantive law of the forum state. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003)). Accordingly, Michgan's law governs the claims asserted by Plaintiffs and the counter-claims asserted by Defendants. *See Wonderland Shopping Ctr.*

*Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001). The Sixth

Circuit Court of Appeals summarized the approach federal courts should take when deciding contract

disputes governed by Michigan law.

> A court's primary responsibility in construing a Michigan contract is to interpret the intent of the parties. The court examines the contract as a whole, giving effect to all parts and language of a written agreement according to their "ordinary and natural meaning." . . . If the parties' intent is unambiguously clear from the language of the written agreement, the court must enforce the parties' intent as expressed in the writing.

*Id.* (citations omitted).

## III. ANALYSIS

### A. Defendants' Motion for Summary Judgment (Dkt. No. 90)[4]

#### 1. Beach of the Distribution Agreement

Defendants argue Wolverine breached its duty to ensure the quality of the Confines footwear.

Defendants assert Wolverine had a duty to inspect the footwear for quality under the terms of the

distribution agreement. Defendants contend Wolverine failed to ensure the Confines boots were

"first quality goods" and therefore materially breached the distribution agreement.

Plaintiffs disagree with Defendants interpretation of the distribution agreement. Plaintiffs

assert they had the right, but not the duty, to inspect goods. Plaintiffs argue nothing in the

distribution agreement functions as a guarantee of quality. Plaintiffs disclaim any liability or

---

[4] Defendants' brief in support is 25 pages, the limit established under the local rules. *See* W.D. MICH. L.CIV. R. 7.2(b). Rather than including a statement of the facts in their brief, however, Defendants attach a series of declarations, in which the declarants set forth facts spanning an additional 44 pages. Included among the declarants is counsel for Defendants. This Court will refer to the exhibits cited by counsel in the declaration, rather than to counsel's declaration for the facts asserted. The exhibits attached to Defendants' brief do not follow the usual numerical sequence and the declarations are not assigned exhibit numbers.

responsibility for the performance of the manufacturer under a different provision of the distribution agreement. Plaintiffs contend Defendants lack evidence that Plaintiffs failed to inspect the goods.

The parties based their arguments on two sections of the distribution agreement. Defendants rely on section 7.2, which provides:

> 7.2 Quality Distributor shall not sell a Product unless the Product meets high safety and structural standards, is fit for its intended use, and is of a style, appearance, quality and consistency that meet Wolverine's and Caterpillar's quality standards and may be properly regarded as "First Quality" goods. Wolverine will perform quality control inspections before shipment of Products and will approve or disapprove Products pursuant to established quality control standards of Wolverine and Caterpillar. Distributor agrees to inspect all Products for damage incurred after the FCR date before offering them for sale and will not permit the sale of any Products properly classified as "Irregular" or "Seconds" or which are otherwise less than "First Quality" goods. Similarly, Distributor will not offer for sale any goods in which the promotional or packaging materials, or any other materials bearing the Trademarks are damaged, defective, "Irregular", "Seconds", or otherwise fail to qualify as "First Quality."

(Distribution Agreement § 7.2.) Plaintiffs rely on section 19.5, which provides

> 19.5 Wolverine shall have no liability, responsibility or exposure for failing to approve any Marketing Plan, Authorized Manufacturer, product, order, advertising plan or expenditure, advertising copy, packaging, or use of the Trademarks. Wolverine shall have no liability, responsibility, or exposure for inability, failure or refusal to assist an Authorized Manufacturer or for an Authorized Manufacturer's performance or nonperformance.

(*Id.* § 19.5.)

To establish a claim for breach of contract under Michigan law, the plaintiff must first establish that a valid contract existed. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (citing *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765, 453 N.W.2d 304 (1990) (per curiam)). The elements of a valid contract are (1) parties who are competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Brown*, 342 F.3d at 628

(citing *Thomas v. Leja*, 187 Mich. App. 418, 422, 468 N.W.2d 58 (1990)). After demonstrating that a valid contract exists, a plaintiff alleging a breach of contract must show (1) the terms of the contract, (2) how the defendant breached the terms of the contract, and (3) that the breach caused the plaintiff's injury. *Brown*, 342 F.3d at 628. Neither party contests that the distribution agreement constitutes a contract.

Assuming the facts in a light most favorable to Plaintiffs, Defendants have not established they are entitled to summary judgment on their breach of contract claim. Under section 7.2, Plaintiffs assumed a duty to inspect the products before shipment to assure the products meet Wolverine's quality standards. Defendants, however, have not provided any evidence showing Plaintiffs breached the duty to inspect. The fact that the boot was defective is not necessarily evidence that the inspection process was somehow deficient or negligent. Defendants acknowledge the defects "in the Confines were not visible or discoverable until end consumers using the Confines discovered them." (Defendants' Brief in Support at 8 n. 24.) Furthermore, Plaintiffs have offered evidence establishing that they performed inspections after the products were manufactured, but before the products were shipped. (Exhibit C to Plaintiffs' Response - Musial Dep. at 7-10.)

In their reply brief, Defendants contend Wolverine breached its duty under section 7.2 because the Confines boots did not meet Wolverine's quality standards. Defendants point out the last sentence in section 7.2 prohibits them from selling products that fail to qualify as "First Quality" products. Defendants argue, because the Confines boots were defective, Wolverine must have breached its duty to provide saleable products to them.

Again, Defendants have failed to show they are entitled to summary judgment on this nuance of their breach of contract claim. The only duty assumed by Plaintiffs through section 7.2 is a duty

to inspect. The evidence offered by Plaintiffs show they perform routine inspections on products before the products are shipped from the manufacturer to the distributor. Defendants acknowledge the defects in the Confines boots were not discoverable until the boots were put to use. Nothing in the plain language of section 7.2 imposes a duty on Plaintiffs, beyond the inspection, to provide, in Defendants' language, "saleable products."

2. Claims Under Michigan's Uniform Commercial Code[5]

Defendants argue the distribution agreement and the purchase orders are governed by Article 2 of the Michigan's Uniform Commercial Code (UCC), MCL § 440.2101, *et seq.* Defendants reason, Wolverine sold them defective goods, the Confines boots, through the purchase orders Defendants sent to Wolverine. Defendants assert, because the goods were defective, Plaintiffs violated the implied warranties of merchantability and fitness, which arise under the UCC. Defendants further assert the waiver of liability is not enforceable under the UCC. Plaintiffs argue this claim is not timely pled, the UCC does not apply to the distribution agreement, and the disclaimer in the distribution agreement absolves them of any potential liability.

Article 2 of the UCC, applies to "transactions in goods." MCL § 440.2102; *Neibarger v. Universal Coops., Inc.*, 439 Mich. 512, 519, 486 N.W.2d 612 (1992). Under Article 2, "a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties . . . ." MCL § 440.2201(1). The terms "contract for sale" and "sale" are defined by the statute.

---

[5] In Defendants' brief in support, the breach of contract claim and the claims arising under the UCC are combined under "Point I."

In this article unless the context otherwise requires "contract" and "agreement" are limited to those relating to the present or future sale of goods. "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price (section 2401). A "present sale" means a sale which is accomplished by the making of the contract.

MCL § 440.2106(1). When goods sold by a merchant fall under Article 2, the goods are accompanied by an implied warranty of merchantability (MCL § 440.2314) and an implied warranty of fitness (MCL § 440.2315). *Neibarger*, 486 N.W.2d at 614-615.

Defendants' claim under the UCC was timely filed. In the first counter-claim, Defendants allege (1) they purchased the defective boots from Plaintiffs (*Id.* ¶ 66), (2) Plaintiffs had a duty to provide saleable goods which were free from defects (*Id.* ¶ 69), (3) Plaintiffs were responsible for the defects in the Confines boots (*Id.* ¶ 70), (4) Plaintiffs were responsible for the defective footwear under the distribution agreement (*Id.* ¶ 73), and (5) Plaintiffs breached their duty to provide saleable footwear free from defects (*Id.* ¶ 81). Under the notice pleading requirement, these allegations provide sufficient notice that Defendants could make a claim under the UCC. *See* Fed. R. Civ. P. 8(a). Defendants alleged Plaintiffs sold them boots, were responsible for providing defect free footwear under the distribution agreement, and breached that duty.

As a matter of law, Defendants are not entitled to summary judgment on their claim under the UCC. The distribution agreement is not a transaction in goods covered by Article 2 of the UCC. First, the terms of the distribution agreement establish the contract is not a transaction in goods. Defendants purchased goods from authorized manufacturers, not from Plaintiffs. (Distribution Agreement §§ 2.1 and 8.2.) Plaintiffs receive, review, and approve purchase orders. (*Id.* § 8.2.) Defendants are responsible for paying the authorized manufacturers for the products; Defendants do

9

not pay Plaintiffs for the products. (*Id.* § 8.3.) Defendants do not point to any portion of the distribution agreement to support their contention that Plaintiffs sold them goods.

Second, Defendants have not offered any evidence establishing a genuine issue of material fact on whether the distribution agreement falls under Article 2. Rather than offering interpretations of the contract language, Defendants discuss the conduct of the parties. Of course, this Court must ascertain the intent of the parties by examining the language of the contract. *Wonderland Shopping Center*, 274 F.3d at 1092. That said, the affidavit offered by Defendants does not support Defendants' claim that they purchased goods from Plaintiffs. Peter DeBlock, the inventory manager for WCI from 2000 until 2005, describes the process used to purchase products. (Defendants' Brief in Support - DeBlock Dec.) Wolverine would provide WCI with a list of prices for products. (*Id.* ¶ 6.) Mr. DeBlock contacted Wolverine for shipping dates and forecasting information to determine how long it would take to fill orders. (*Id.* ¶ 8.) Mr. DeBlock would send purchase orders to Wolverine (*Id.* ¶ 13), who would then decide whether to approve the order (*Id.* ¶ 15). Mr. DeBlock had no direct contact with the manufacturers. (*Id.* ¶ 22.) After a purchase order was approved, Wolverine would sent WCI a "pro forma invoice" indicating the dates on which the footwear would be shipped from the manufacturer to WCI. (*Id.* ¶ 23.) According to the instructions on the invoice, WCI was to pay the manufacturer directly. (*Id.* ¶ 24; Defendants' Brief in Support - Exhibit 2 - Sample Pro Forma Invoice). After the products were shipped from the manufacturer, Wolverine would issue a second invoice to WCI which identified the factory costs as well as the commission fees and any other costs. (DeBlock Dec. ¶ 26; Defendants' Brief in Support - Exhibit 3 - Invoice.) The facts outlined by Mr. DeBlock are entirely consistent with the terms of the distribution agreement. The plain, ordinary language of the distribution agreement declares that Plaintiffs only

approve purchases from authorized manufacturers, they do not sell goods to their distributors.

Third, under Michigan law, distributorship agreements lacking quantity terms do not constitute a contract for the sale of goods under Article 2 of the UCC. *AB Prods. v. Dampney Co., Inc.*, No. 89-1871, 908 F.2d 972 at *2 (6th Cir. July 24, 1990) (per curiam) (unpublished table opinion) (citing *Lorenz Supply Co. v. American Standard, Inc.*, 419 Mich. 610, 358 N.W.2d 845 (1984) (*Lorenz II*)). *See KP Building Prods., Inc. v. Ciraulo Bros. Building Co.*, No. 08-cv-11520, 2008 WL 5422693 at * 5 n. 2 (E.D. Mich. Dec. 30, 2008) (Borman, J.) ("[a]lthough the rule formulated in *Lorenz* clearly is the minority rule regarding distribution agreements, . . . , it still appears to be good law in Michigan." (citations omitted)). The drafters of the UCC did not intend for all distributorship agreements to constitute contracts for the sale of goods. *Lorenz II*, 358 N.W.2d at 847 (1984).

This distributorship agreement does not contain a quantity term. The agreement does not obligate Defendants to buy any products from Plaintiffs. The agreement is neither a requirement nor an output contract. *See* MCL § 440.2306(1) (describing output and requirement contracts); *Lorenz Supply Co. v. American Standard, Inc.*, 100 Mich. App. 600, 615, 300 N.W.2d 335 (1981) (*Lorenz I*). The agreement does require Defendants to purchase a minimum quantity of products. (Distributorship Agreement § 9.) However, those products are purchased from the authorized manufacturers, not from Plaintiffs. The minimum quantity specified in the agreement does not constitute a "sale," as that term is defined in the statute, such that title of the goods transfer from Plaintiffs to Defendants. *See* MCL § 440.2106(1) and MCL § 440.2401.

Defendants' other argument here, that the purchase orders sent to Wolverine constitute contracts for the sale of goods, is unpersuasive. The purchase orders identify the products ordered

11

by an item number, a style number, the name of the product, the color of the product, and the number of each product ordered in a given size. (Defendants' Brief in Support - Exhibit 1 - Purchase Orders.) The orders identify the expected date of shipment from the factory. (*Id.*) Wolverine Canada and its contact information is listed at the top of the page and names of individuals with WCI are listed at the bottom of the page. (*Id.*) No prices are listed anywhere on the purchase orders. The name "Wolverine" and information about Wolverine are not included anywhere on the purchase orders.[6] Defendants cite *S.C. Gray, Inc. v. Ford Motor Co.*, 92 Mich. App. 789, 286 N.W.2d 34 (1979) to show that purchase orders may be contracts. The facts in *S.C. Gray* are easily distinguishable. The purchase order at issue in *S.C. Gray* was submitted to Ford by the manufacturer of the product Ford was purchasing. *Id.* at 38. Here, Wolverine was neither manufacturing a product nor purchasing a product, but approving a purchase by a distributor of a product made by one of Wolverine's authorized manufacturers.

Defendants' claims under the UCC fail as a matter of law because, under Michigan law, the distribution agreement does not constitute a contract for the sale of goods. Obviously, if the contract does not fall under Article 2, no implied warranty of merchantability or fitness attaches. In addition, Defendants argument that the disclaimer is unenforceable under the Article 2 must fail because the distribution agreement does not fall under Article 2 of the UCC.[7]

---

[6]

On some of the purchase orders submitted as exhibits, the words "to: Kristina Stearns" is handwritten. (*See e.g.,* Purchase Orders at WCI 001289 and WCI 001322.) Kristina Stearns was the person at Wolverine to whom Mr. DeBlock would send the purchase orders for approval.

[7]

Portions of Defendants' brief on this issue are broadly worded and suggest a court may find disclaimers unconscionable when the disclaimer causes one party to be without a remedy. A review of the cases cited by Defendants confirm that each case relies on provisions of Michigan's Uniform Commercial Code. *See Sullivan Indust. v. Double Seal Glass Co.*, 192 Mich. App. 333, 480 N.W.2d

### 3. Plaintiffs' Claims Under the TAP Agreement

Defendants argue, under Michigan law, Plaintiffs must prove damages with reasonable certainty, using definitive admissible evidence, and the damages may not be based on mere speculation.[8] First, Defendants argue they are not liable under the TAP for three debit notes because it cannot be determined who shipped the footwear. Plaintiffs counter the evidence establishes the footwear at issue on the three debit notes was sold by WCI. Second, Defendants argue Plaintiffs are not entitled to a reduction in purchase price for shipment levels because Plaintiffs failed to use the formula provided by the TAP. Plaintiffs respond the evidence demonstrates the shipment levels were below the levels required under the TAP. Third, Defendants argue WCI is not responsible for markdowns on two footwear brands because those markdowns were not consistent with past practices. Plaintiffs reply they had authority under the TAP to grant the markdowns.

The first issue under the TAP concerns the allocation of financial responsibility for products returned by Mark's Work Warehouse. When negotiating the TAP, the parties anticipated that products sold prior to the date the TAP became effective would be returned after the date the TAP became effective. The parties allocated financial responsibility for those returned products under

---

623 (1991); *Kelynack v. Yamaha Motor Corp.*, 152 Mich. App. 105, 394 N.W.2d 17 (1986); and *Latimer v. William Mueller & Son, Inc.*, 149 Mich. App. 620, 386 N.W.2d 618 (1986)

[8] Although Defendants may have correctly stated the law for the burden of proof *at trial*, Defendants' proposition is not the appropriate standard for resolving a motion for summary judgment. All four cases cited by Defendants discussed the proofs offered at trial. *See Refrigerating Equip. Co. v. Finch*, 257 Mich. 623, 626, 242 N.W. 217 (1932); *Mt. Ida Sch. for Girls v. Rood*, 253 Mich. 482, 489-490, 235 N.W. 227 (1931); *S.C. Gray*, 286 N.W.2d at 39-40; *Benfield v. H.K. Porter Co.*, 1 Mich. App. 543, 546-547, 137 N.W.2d 273 (1965). Defendants would be entitled to summary judgment if there was no genuine issue of material fact that Plaintiffs could not meet this burden at trial.

section 9(f) of the TAP.  The section begins

> (f) Seller shall be responsible for: (1) all returns of products sold by Seller on or before the Closing Date (2) all credits issued or payments or other accommodations made or to be made in connection with products sold by Seller on or before the Closing Date and (3) all deductions or credits taken by, claimed by or owed to a customer or an end-user consumer relating to products sold by Seller on or before the Closing Day (collectively, "Customer Returns/Credits").[9]

(TAP § 9(f).)  Essentially, WCI is financially responsible for footwear sold on or before January 4, 2005.  The TAP then provides for several contingencies.  First, when the customer identifies the date the footwear was received or the applicable invoice, the responsibility for the footwear is determined under section 9(f).  (*Id.* § 9(f)(i).)  Second, when the customer does not indicate when the footwear was received, but the "business records" of either Buyer or Seller "clearly indicate that the Customer Accommodation relates to a specific time period or invoice before or after the Closing Date," the responsibility for the footwear is determined under section 9(f).  (*Id.* § 9(f)(ii).)  Finally, if no responsibility can be made under either (f)(i) or (f)(ii), the responsibility for the footwear falls on Seller if the return or request for credit is made on or before 150 days after the closing date, and on Buyer after 150 days after the closing date.  (*Id.* § 9(f)(iii).)

The three debit notes contain little information.  (*See* Defendants' Brief in Support - Exhibits 23, 24 and 25 - July Debit Notes.)  Two of the three notes are dated July 6, 2005 and the third is dated July 7, 2005.  Therefore, all three notes were submitted more than 150 days after the effective date of the TAP.  All three of the notes indicate the products were returned to Mark's Work Warehouse between January 2, 2005 and July 2, 2005.  (*Id.*)  The three notes identify the amount

---

[9] "Seller" refers to WCI and "Buyer" refers to Plaintiffs.  (TAP - Introduction.)  The "closing date" is January 4, 2005.  (*Id.* § 3.)

owed for the returned products. (*Id.*) Based upon the product or style numbers identified on the first note, the amount owed appears to be related to returns of Confines footwear. (*Compare* Exhibit 23 - First July 6 Debit Note *and* Exhibit 1 - Purchase Order at WCI 001285 and WCI 001294.) It is not apparent from the information on the other two debit notes what products were returned. (*See* Exhibits 24 and 25.)

Defendants argue they cannot be held liable for certain footwear returned by Mark's Work Warehouse under the terms of the TAP. Defendants claim it is impossible to determine whether the footwear claimed in the July Debit Notes was shipped by Wolverine or by WCI. Defendants assert, based upon the lack of information available about the footwear at issue in the July Debit Notes, under section 9(f), the financial responsibility for the returned goods falls on Plaintiffs because the claim was made by Mark's Work Warehouse more than 150 days after the effective date of the TAP.

Plaintiffs believe the undisputed evidence confirms the debit notes relate to products sold by WCI. Plaintiffs argue their business records establish the quality issues with the Confines footwear was resolved by November 2004. Rather than citing business records, Plaintiffs cite a portion of Dennis Robinson's deposition where he testified that the Confines footwear manufactured starting in 2005 no longer had stitching problems. (Plaintiffs' Response Brief - Exhibit H - Robinson Dep. at 77-79.) Mr. Robinson testified the number of returns of Confines shoes then diminished, especially in the second half of 2005. (*Id.* at 78.) Because the number of returns fell, Mr. Robinson assumed the Confines boot no longer had defects. (*Id.*) Plaintiffs conclude the majority of the returned products reflected in the July Debit Notes would have been prior to the date the TAP became effective, and therefore the responsibility for the returns falls on Defendants.

Defendants are not entitled to summary judgment on the issue of liability for the July Debit

15

Notes. Viewing the evidence in a light most favorable to Plaintiffs, as the nonmoving party, there exist genuine issues of material fact as to which party will bear the responsibility for the returned products referenced in the July Debit Notes. For the purpose of Defendants' motion, Plaintiffs need only demonstrate a genuine issue of material fact, not conclusively establish with admissible evidence which party bears the financial burden for the returned products. Mr. Robinson's testimony provides more than speculation and more than a scintilla of evidence on the issue. Assuming the facts alleged by Mr. Robinson are true, the Confines products sold after November 2004 were defect free and therefore would not have been returned in the volume reflected in the June Debit Notes.

The second issue under the TAP concerns shipment levels during the period between January 3, 2005 to June 30, 2005. The TAP Agreement authorizes a purchase price reduction in favor of Plaintiffs if the level of shipments during that period falls below $7,500,000.00. (TAP § 10(d).) The section provides

> (d) In the event that shipments in the period from January 3, 2005 to June 30, 2005 of Wolverine and Caterpillar footwear against the Customer Purchase Orders existing on the Closing Date ("Purchase Order Deliveries") fails to meet the levels shown below, the Purchase Price shall be reduced by the corresponding amount shown below and such amount may be withheld from the Holdback and any additional amounts owed shall be paid by Sellers.
>
> ***
>
> The parties agree that any Customer Purchase Orders which are not shipped and accepted by Customers in the period from January 3, 2005 to June 30, 2005 as a direct result of Buyer's inability to deliver the product or failure of Buyer's systems to properly process the order shall be deemed to be Purchase Order Deliveries and shall be included in the total Purchase Order Deliveries for purposes of the table above.

(TAP § 10(d).)

Defendants argue Plaintiffs are not entitled to a purchase price reduction. Plaintiffs claim only $6,350,000 worth of goods were shipped between January 3, 2005 and June 30, 2005.

Defendants assert Plaintiffs failed to include in that amount any shipments delayed past June 30, 2005. As evidence of Plaintiffs' miscalculation, Defendants allege the warehouse from which the goods were shipped experienced "growing pains" during the relevant time period and that "some orders were shipped later than specified by the customer." (Defendants' Brief in Support - Exhibit 12 - Coughlin Dep. at 112-113.) David Coughlin testified no one at Wolverine ever attempted to determine whether there were WCI orders that should have been shipped prior to June 30, 2005 from the warehouse, but were not shipped until after June 30, 2005. (*Id.* at 113.)

Plaintiffs assert the undisputed evidence shows they are entitled to a purchase price reduction. The value of the goods shipped against WCI's orders during the relevant time period totaled $6,350,000. (Plaintiffs' Response - Exhibit I - Coughlin Dep. at 75.) Plaintiffs assert Defendants have no evidence that any shipments were ever delayed. Mr. Robinson testified, to his knowledge, all the shipments contained in WCI's books were complete by the end of June. (Robinson Dep. at 128-129.) Auby Paikin testified some shipments of goods on WCI's order books were delayed during the relevant time period, but to his knowledge, no shipments which were part of the accounts he oversaw were not shipped by June 30, 2005. (Plaintiffs' Response - Exhibit J - Paikin Dep. at 18-19.)

Defendants are not entitled to summary judgment on the issue of the purchase price reduction. Viewing the evidence in a light most favorable to Plaintiffs, as the nonmoving party, there exist genuine issue of material fact whether all the shipments for orders on WCI's books were made by June 30, 2005. All parties agree that shipments from the warehouse during the relevant time period experienced delays. Plaintiffs have produced the testimony of two individuals who claim, to their knowledge, all the shipments of orders on WCI's books were made by June 30.

Defendants only evidence on this issue is Mr. Coughlin's statement that, to his knowledge, no one at Wolverine ever checked to see whether any shipments were delayed.

The third issue under the TAP concerns the holdback amount from markdowns on Scion and Bolton footwear. Based on the scant information provided in the briefs, it appears, under the distribution agreement, Defendants sold Scion and Bolton footwear to retailers. After the TAP became effective, Plaintiffs authorized retailers to sell the Scion and Bolton footwear at markdown prices and then shifted the financial difference to Defendants. Plaintiffs admit they granted the markdown credits on the footwear. (Plaintiffs' Response at 19.) According to Defendants, the TAP requires Plaintiffs to handle claims, credits and returns for products sold prior to the TAP in a manner consistent with past practices. Defendants argue Plaintiffs are not entitled to shift the financial responsibility for the markdowns because the markdown was not consistent with their past practices. Plaintiffs argue that the TAP gives them complete discretion to grant customer accommodations. Plaintiffs further argue Defendants' evidence on this issue does not support Defendants' claim.

The amount at issue for the markdowns is $40,018.00.[10] (Defendants' Brief in Support - Exhibit 27.) When asked about the amount, David Coughlin explained Mark's Work Warehouse requested "markdown money related to product sold in 2004 related to performance or sell-through of that product." (Coughlin Dep. at 163.) The final portion of section 9(f) of the TAP provides

> In the event that (a) any Customer Return/Credit relating to Caterpillar or Wolverine products received by customers on or prior to the Closing Date is not handled by Seller in a manner that is fair to the customer and consistent with the Seller's past practice in the ordinary course of business or (b) Customers take or are

---

[10] The Court assumes the figures presented are in Canadian dollars.

> due credits or deductions, which relate to Caterpillar or Wolverine products received on or prior to the Closing Date, against accounts receivable or other amounts owed to Buyer, Buyer may in its discretion grant the applicable Customer Accommodation ("Credit Adjustment") to the customer and deduct such Credit Adjustment amount from the Holdback. If such Credit Adjustments are greater than the Holdback, Seller will reimburse Buyer for the amount not covered by the Holdback.

(TAP § 9(f).) Mr. Coughlin believed Mr. Paikin and Mr. Robinson would have fielded markdown requests from customers. (*Id.* at 164.) Mr. Robinson agreed he and Mr. Paikin, in discussion with Mr. Coughlin, would have made the decision whether to grant Mark's Work Warehouse the markdown. (Robinson Dep. at 171.) Mr. Paikin recalled the same individuals were involved in making the decision to grant this markdown. (Paikin Dep. at 133.) Mr. Robinson testified, while working at WCI, he had never given a similar markdown to Mark's Work Warehouse. (Robinson Dep. at 171.) Mr. Paikin stated, while standard business practice in the industry, he could not recall a time when WCI had ever authorized a similar markdown for Mark's Work Warehouse. (Paikin Dep. at 133.)

Defendants are not entitled to summary judgment on the markdown claim. Section 9(f) identifies two possible contingencies. Under the first contingency, Defendants, as the Seller, receive footwear sold on or prior to the closing date of the TAP from customers and the returns are not handled by *the Seller* in a manner that is fair to the customer or consistent with the Seller's past practice. Under the second contingency in section 9(f) of the TAP, customers take or are due credits or deductions which relate footwear sold prior to the effective date of the TAP against accounts receivable or other amounts owed to Plaintiffs, as the Buyer. Under either contingency, paragraph 9(f) authorizes Plaintiffs, in their discretion, to grant a customer adjustment and deduct the adjustment from the holdback. Under either scenario, Wolverine had the authority to make an

adjustment or accommodation for the customer and deduct that amount from the holdback. There exists genuine issues of material fact whether either contingency occurred. The facts are not clear as to which party handled the retailer's request. In the event either contingency occurred, Plaintiffs had the authority to grant the accommodation and shift the difference to Defendants.

### 4. Breach of Fiduciary Duties

Defendants allege Plaintiffs acted as an agent when negotiating a settlement with Golden Chang over the defective Confines boots. Defendants assert Wolverine is liable for the difference between the amount of the settlement and the value of the defective footwear. Defendants argue Plaintiffs breached fiduciary duties. Plaintiffs respond this agency claim was not raised in Defendants' counter-claims. Plaintiffs argue, under both the terms of the distribution agreement and Michigan law, no agent-principal relationship exists. Plaintiffs also assert, even if such a relationship exists, there is no evidence that Wolverine breached any fiduciary duties owed.

Whether an agency relationship existed is determined under Michigan law. "Under the common law of agency, in determining '[w]hether an agency has been created,' we consider 'the relations of the parties as they in fact exist under their agreements or acts' and note that in its broadest sense agency, 'includes every relation in which one person acts for or represents another by his authority.'" *St. Clair Intermediate Sch. Dist. v. Intermediate Educ. Ass'n/Michigan Educ. Ass'n*, 458 Mich 540, 558, 581 N.W.2d 707 (1998) (quoting *Saums v Parfet*, 270 Mich. 165, 170-171, 258 N.W. 235 (1935)). In Michigan, the "test of whether an agency has been created is whether the principal has the right to control the actions of the agent." *Meretta v Peach*, 195 Mich. App. 695, 697, 491 N.W.2d 278 (1992) (citing *Little v. Howard Johnson Co.*, 183 Mich. App. 675, 455 N.W.2d 390 (1990)). *See also Martin v. Thrifty Rent A Car*, 145 F.3d 1332, 1998 WL 211786 at *

6 (6h Cir. Apr. 23, 1998) (unpublished table opinion) (per curiam); *St. Clair Intermediate Sch. Dist.*, 581 N.W.2d at 716 (citing *Capital City Lodge No. 141, FOP v. Meridian Twp.*, 90 Mich. App. 533, 541, 282 N.W.2d 383 (1979)). The parties' designation of the relationship is not controlling. *Lincoln v. Fairfield-Nobel Co.*, 76 Mich. App. 514, 520, 257 N.W.2d 148 (1977); *Van Pelt v. Paull*, 6 Mich. App. 618, 624, 150 N.W.2d 185 (1967) (quoting 3 Am. Jur. 2d, Agency § 21, p. 430)). *But see Potomac Leasing Co. v. French Connection Shops, Inc.*, 172 Mich. App. 108, 431 N.W.2d 214 (1988) (finding defendants had no evidence to support the existence of an agency relationship and noting the lease agreement "specifically disclaims any agency relationship"). "Where there is a disputed question of agency, any testimony, either direct or inferential, tending to establish agency creates a question of fact for the jury to determine." *Meretta*, 491 N.W.2d at 279-280 (citing *Jackson v. Goodman*, 69 Mich. App. 225, 230, 244 N.W.2d 423 (1976). *See also Martin*, 1998 Wl 211786 at * 6; *Miskiewicz v. Smolenski*, 249 Mich. 63, 70, 227 N.W.2d 789 (1929) (citing *Harris v. Smith*, 79 Mich. 54, 44 N.W. 169 (1889); *Hertz Corp. v. Volvo Truck Corp.,* 210 Mich. App. 243, 246, 533 N.W.2d 15 (1995); *Lincoln*, 257 N.W.2d at 150; *Van Pelt*, 150 N.W.2d at 188.

The agent's authority may be either actual or apparent. *Alar v. Mercy Mem'l Hosp.*, 208 Mich. App. 518, 528, 529 N.W.2d 318 (1995) (citing *Meretta*, 491 N.W.2d at 280). Actual authority may be either express or implied. *Id.* Implied authority is the authority that an agent believes he or she possesses. *Id.* Implied authority may arise from the conduct of the principal and circumstances over time, but not contrary to the express intentions of the principal. *Flat Hots Co., Inc. v. Peschke Packing Co.*, 301 Mich. 331, 337, 3 N.W.2d 295 (1942) (citing *Weller v. Speet*, 275 Mich. 655, 659, 267 N.W. 758 (1936). "An implied agency must 'rest upon acts and conduct of the alleged agent known to and acquiesced in by the alleged principal prior to the incident at bar.'" *Norcross Co. v.*

*Turner-Fisher Assocs.*, 165 Mich. App. 170, 181, 418 N.W.2d 418 (1988) (quoting *Shinabarger v. Phillips*, 370 Mich. 135, 139, 121 N.W.2d 693 (1963)). *See Martin*, 1998 WL 211786 at * 7 (summarizing Michigan law on implied agency). Whether an implied agency exists is generally a question of fact. *Norcross*, 418 N.W.2d at 423.

Defendants' agency claim was timely raised. In Defendants' first counter-claim, Defendants assert "[u]nbeknownst to defendants, plaintiffs engaged in settlement negotiations with Golden Chang, purportedly acting on defendants' behalf. Plaintiffs then accepted three settlement payments from Golden Chang without any input on offer or acceptance of the settlement from defendants." (Answer and Counter-Claims ¶ 83.) Under the notice pleading requirement of the Federal Rules of Civil Procedure, this allegation is sufficient to put Plaintiffs on notice of Defendants' agency theory. *See* Fed. R.Civ. P. 8(a).

Defendants rely on the theory of implied agency. (*See* Defendants' Brief in Support at 18-21.) Defendants assert the parties, through their conduct and through their agreements, allowed Wolverine to act as an agent for WCI for the purpose of dealing with Golden Chang and other manufacturers. The distribution agreement required WCI to send purchase orders to Wolverine, who would then approve the orders and send them to the manufacturers. (Distribution Agreement § 8.2.) The agreement prohibited WCI from arranging for the manufacture of products directly with the manufacturers. (*Id.* § 15.7.) The practice of the two companies was to have all business with the manufacturers routed through Wolverine. (DeBlock Dec. ¶¶ 10-20; Couglin Dep. at 32.) In fact, WCI had no direct communication with the manufacturers, including Golden Chang. (DeBlock Dec. ¶ 20; Coughlin Dep. at 31-32.)

Regarding the Confines boots and Golden Chang, Defendants assert Wolverine assumed the

task of negotiating with the manufacturer and WCI acquiesced to Wolverine's actions. Richard Hunt, in his declaration, states during the negotiation of the TAP Agreement, Mr. Zwiers assured him the defective Confines were a separate issue from the TAP and did not need to be included in the TAP Agreement. (Defendants' Brief in Support - Hunt Dec. ¶ 33.) Mr. Hunt further states Mr. Zwiers "told me not to worry about it and that Wolverine would take care of it" (*Id.* ¶ 37) and that he "would not have signed the TAP Agreement without Zwiers' assurance that Wolverine was going to take care of ensuring that WCI was reimbursed for any costs associated with the defective Confines" (*Id.* ¶ 38). Mr. Hunt states "Wolverine had asked for WCI to wait for payment for the defective Confines until Wolverine had a chance to address the issue with the factory." (*Id.* ¶ 57.) Finally, Mr. Hunt states he received a letter from Mr. Zwiers indicating Golden Chang was offering to settle the defective footwear issue for $70,000, but that Mr. Hunt had no input or approval for that amount. (*Id.* ¶ 60.) Other testimony provides insight into how Wolverine and Golden Chang resolved the issue of the defective boots. David Coughlin testified Wolverine accepted $100,000 from Golden Chang, representing about $26,000 for repairs related to the footwear that Wolverine paid for and another $74,000 as a settlement of the issue. (Couglin Dep. at 83-84.) James Zwiers confirmed that Wolverine would have been communicating with Golden Chang about the amount of the settlement. (Defendants' Brief in Support - Exhibit 22 - Zwiers Dep. at 161.)

Plaintiffs respond by pointing to other alleged facts. First, Plaintiffs point out the distribution agreement expressly disavows the creation of an agency relationship. (Distribution Agreement § 21.3.) Second, Plaintiffs assert they had no authority to bind Defendants to any resolution of the defective foowear issue with Golden Chang. John Burch testified he did not negotiate with Golden Chang on behalf of Wolverine, but on behalf of WCI. (Plaintiffs' Response - Exhibit G - Burch Dep.

at 67-68.) Mr. Burch also testified the claim would not be closed until the manufacturer and Wolverine's partner, in this case WCI, both agreed to accept a particular outcome. (*Id.* at 68-69.) James Zwiers testified he told Mr. Hunt that WCI needed to work out a resolution to the defective boots with Golden Chang and that Wolverine "would continue to act in our liaison role to work to facilitate a resolution of that on behalf of Wolverine." (Zwiers Dep. at 50-51.) Mr. Zwiers does not recall telling Mr. Hunt that Wolverine would reimburse WCI for the defective boots once Wolverine was reimbursed by Golden Change.

Defendants have not established they are entitled to summary judgment on their agency theory. Assuming the facts in a light most favorable to Plaintiffs, the parties have presented conflicting testimony on the question of whether Plaintiffs negotiated with Golden Chang on behalf of Defendants and whether Defendants exercised any control of Plaintiffs. Plaintiffs reliance on the distribution agreement does not resolve the issue. Although the distribution agreement disclaims the creation of any agency relationship, the conduct of the parties is determinative under Michigan law. With such conflicting testimony, the question of whether an agency relationship existed is one the jury should answer.

On the assumption that an agency relationship existed, the parties dispute whether any fiduciary duty was breached. Defendants contend Plaintiffs breached their fiduciary duty by withholding vital information relevant to the negotiations with Golden Chang. Defendants also assert Plaintiffs should have afforded Defendants the opportunity to accept or reject any settlement offer. Plaintiffs counter than they never shut Defendants out of the negotiations with Golden Chang. Plaintiff also assert they never settled any claim with Golden Chang and that Defendants' claim against Golden Chang remains open.

An agent has an affirmative duty to disclose to his or her principal. *Silberstein v. Pro-Golf of America, Inc.*, 278 Mich. App. 446, 458, 750 N.W.2d 615 (2008) (citing *Brownell v. Garber*, 199 Mich. App. 519, 527, 503 N.W.2d 81 (1993)). *See also Sch. Dist. of the City of Pontiac v. Sachse*, 274 Mich. 345, 351, 264 N.W. 396 (1936) ("an agent [shall] fully inform the principal of all facts relating the to the subject-matter of the agency which come to the knowledge of the agent and which is material for the principal to know for the protection of his business" (quoting Mecham on Agency, § 1207)); *Guggisberg v. Ostego County Co-op Ass'n*, 258 Mich. 553, 559, 242 N.W. 749 (1932) ("[i]t is the duty of an agent to communicate to his principal facts relating to the business which ought in good faith be made known to the latter" (quoting *Michigan Crown Fender Co. v. Welch*, 211 Mich. 148, 178 N.W. 684 (1920)). An agent is a fiduciary and owes his or her principal the duty of good faith and loyalty. *Burton v. Burton*, 332 Mich. 326, 337, 51 N.W.2d 297 (1952) (quoting 2 Am. Jur. p. 202[11]). Agents are not permitted to act for themselves at the expense of their principals during the course of the agency. *Cent. Cartage Co. v. Fewless*, 232 Mich. App. 517, 524-525, 591 N.W.2d 422 (1998) (citing *Prod. Finishing Corp. v. Shields*, 158 Mich. App. 479, 486-487, 405 N.W.2d 171 (1987)). *See also Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 49, 698 N.W.2d 900 (2005) (per curiam) ("under general agency principles, HMSC owed its client duties of good faith, loyalty and avoidance of self dealing").

James Zwiers testified the decision to accept or deny the $100,000 settlement offer from Golden Chang "would have been WCI's." (Zwiers Dep. at 160.) David Coughlin stated he did not know if anyone with Wolverine consulted WCI before agreeing the Golden Chang's offer.

---

[11]

The opinion does not include a complete citation to the referenced material.

(Coughlin Dep. at 84.) Mr. Coughlin also testified he did not know if Wolverine ever made WCI aware of the payments by Golden Chang to Wolverine based on the settlement. (*Id.* at 87.) Richard Hunt concedes he met with representatives of Golden Chang on one occasion to discuss the issue, but describes his role in the meeting as "essentially a bystander and was not at all involved the negotiations." (Hunt Dec. ¶ 58.) John Burch testified Mr. Hunt asked him to set up the meeting. (Burch Dep. at 20.) Mr. Burch stated Mr. Hunt asked "for my assistance in negotiating between the two parties," which he did. (*Id.* at 22.) The agreement reached at the meeting involved the stitching problem and not on the dollar value of the claim. (*Id.* at 23.) Mr. Burch affirmed that until Mr. Hunt agreed to the amount, the claim would have remained open. (*Id.* at 39.) Finally, Mr. Zwiers sent Mr. Hunt a letter after the TAP was finalized outlining various issues, including a short discussion of the payments by Golden Chang to Wolverine. "Golden Chang has paid us for the repair of certain Confine products and Wolverine is prepared to offset the purchase price for these products from the significant amounts owed by WCI to Wolverine as part of a resolution of outstanding amounts." (Defendants' Brief in Support - Exhibit 6 - Zwier Letter.)

Assuming an agency relationship existed and viewing the facts in a light most favorable to Plaintiffs, Defendants are not entitled to summary judgment on their breach of duty claim. The testimony relied upon by Plaintiffs concedes the decision whether to accept the offer would have been made by WCI. Plaintiffs' testimony further demonstrates Wolverine handled the negotiation of the settlement offer. The only evidence that Wolverine attempted to disclose information to WCI is an admission by Mr. Hunt that he was told about an offer. Whether this was sufficient disclosure or somehow fulfills Wolverine's duty of good faith and loyalty is a question of fact. The statements indicating individuals at Wolverine do not consider the matter closed do not dispose of the issue of

damages. Those statements are inconsistent the testimony that WCI should have had the final say as to whether to accept the offer. Furthermore, Mr. Zwiers' letter could be interpreted as an admission that the payments accepted by Wolverine from Golden Chang were insufficient to cover the purchase price for the products. These facts leave open the question of whether a duty was breached and what damages may be claimed as a result.

     5.  Plaintiffs' "Admissions"

Defendants argue Plaintiffs admit they breached the TAP and owe Defendants both a holdback amount and an amount for the inventory purchased. Plaintiffs argue the amounts identified by Defendants are not properly resolved in this motion for summary judgment. Plaintiffs reason they are not required to pay Defendants these amounts if Defendants have other financial obligations arising from other portions of the TAP. Plaintiffs argue, until all of the claims are resolved, any setoff amounts remain genuine issues of material fact.

Section 4(b) of the TAP provides Plaintiffs will hold back ten percent of all payments of the purchase price for 180 days. (TAP § 4(b).) The holdback money was to be used "to facilitate financial adjustments and to satisfy indemnification and other obligations" under the TAP as set forth in paragraph 9. (*Id.*) James Zwiers and Richard Hunt both agree the amount of the holdback is $265,845.98. (Zwiers Dep. at 135; Hunt Dec. ¶ 61a.) *(See also* Defendants' Brief in Support - Exhibit 8 and 39 - Zwiers 10/21/05 Letter.[12]) Mr. Hunt states Wolverine agreed it owes WCI $223,429 for Confine inventory transferred to Wolverine as part of the TAP.[13] (Hunt Dec. ¶ 61b.)

_____

[12]

Defendants submitted the letter as two different exhibits.

[13]

Defendants also cite page 23 of Mr. Coughlin's deposition and page 135-136 of Mr. Zwiers' deposition on this point. Neither of the pages cited mention or support the dollar figure asserted by

Mr. Hunt states Wolverine agreed it owes WCI $38,265.40 for operating expense paid by WCI on behalf of Wolverine.[14]  (Hunt Dec. ¶ 61c.)  Mr. Zwiers admits there were operating expenses paid by WCI on behalf of Wolverine and that Wolverine owes WCI for repairs on Confines products, but did not provide any specific amount.  (Zwiers 10/21/05 Letter.)  Defendants assert Wolverine admits it owes WCI a $4,428.32 credit against amounts claimed by Wolverine on Debit Note 2008273.  As evidence, Defendants reference several pages from Auby Paikin's deposition and Exhibits 30 and 31.  As explained by Mr. Paikin, this money arises from a volume discount provided to Mark's Work Warehouse.  (Paikin Dep. at 94-95.)  Mr. Paikin agreed to the statement that the amount "should have been taken off this debit note . . . to avoid giving Mark's a double credit on the volume rebate." (*Id.* at 95.)

Viewing the facts in a light most favorable to Plaintiffs, Defendants are not entitled to summary judgment on this issue.  Although Defendants characterize the evidence offered as "admissions," none of the evidence cited constitutes an admission that Plaintiffs owe Defendants a specific amount of money.  The parties do agree on the amount of the holdback.  Under secton 4(b) of the TAP, the holdback money is used to offset various financial obligations, some of which are pending issues in this litigation.  Although Mr. Zwiers does admit Wolverine owes Defendants money relating to operating expenses and repairs to Confines footwear, he does not identify a

_____

Defendants or discuss the amount owed for inventory purchases.

[14]

Defendants also cite page 23 and page 180 of Mr. Coughlin's deposition and page 135-136 of Mr. Zwiers' deposition on this point.  None of the pages cited mention or support the dollar figure asserted by Defendants.  Mr. Coughlin does not discuss operating expenses on page 23 of his deposition.  On page 180, Mr. Coughlin states Wolverine owes WCI approximately $228,000 for repaired Confines.  Mr. Zwiers could not recall any specifics when asked about operating expenses.

specific dollar amount owed. Mr. Paikin's testimony discusses a credit from Mark's, however, the evidence offered does not conclusively establish how or why WCI is owed that money from Wolverine. In Defendants' reply brief, Defendants argue they are entitled to summary judgment on this issue because Plaintiffs have failed to provide evidence to support their claims. Whether Plaintiffs have supported the claims raised in their motion will be considered separately. On Defendants' motion, there continues to be genuine issues of material fact.

B. Plaintiffs' Motion for Summary Judgment (Dkt. No. 91)

Plaintiffs seeks partial summary judgment. Plaintiffs request summary judgment on a portion of the issues raised in their complaint and some of the issues raised by Defendants' counter-claims.

1. Firm Orders

Plaintiffs argue they are entitled to a reduction in the purchase price because Defendants' firm orders fell below 65%. Under section 7(g) of the TAP, Defendants represented that the customer purchase orders recorded in its books for delivery between January 4, 2005 and June 30, 2005 were not less than $8,000,000 dollars. (TAP § 7(g).) Defendants further represented that 65% of those orders were firm orders. (*Id.*) Under section 10, if the customer purchase orders failed to meet the representations made in section 7(g), Plaintiffs were entitled to a reduction in the purchase price. (*Id.* § 10.) If the percentage of firm orders fell between 60% and 64.9% of the customer purchase orders, Plaintiffs were entitled to a reduction in the purchase price of $50,000. (*Id.* § 10(b).) Wolverine's business records establish the firm orders were only 63% of the total purchase orders. (Plaintiffs' Brief in Support - Exhibit 7.) David Coughlin testified the order book received from WCI revealed the firm orders constituted less than 65% of the total orders. (Coughlin Dep. at 14-15.)

Plaintiffs are entitled to summary judgment on this point. Viewing the facts in a light most favorable to Defendants, as the nonmoving party, Plaintiffs are entitled to a reduction in the purchase price under section 10(b) of the TAP. The evidence submitted by Plaintiffs establish the firm orders represented only 63% of the total order in Defendants' book. Defendants have offered no documents to undermine the facts provided by Plaintiffs. Defendants concede this issue in their response brief. (Defendants' Response at 4 n. 4.)

## 2. Shipment Levels

Plaintiffs argue they are entitled to a reduction in the purchase price based on the shipment levels between January 3, 2005 and June 30, 2005. This issue was raised by Defendants in their motion. Under section 10(d) of the TAP, shipment levels during the relevant period had to reach a minimum of $7.5 million or Plaintiffs would be entitled to a reduction in the purchase price. Plaintiffs assert the actual value of the shipments during this time was $6,350,000. If that figure is correct, Plaintiffs would be entitled to a purchase price reduction of $150,000. (TAP § 10(d).) Defendants argue Plaintiffs are not entitled to summary judgment because the evidence does not establish that all of the orders placed were timely shipped.

Plaintiffs have established the value of the orders shipped totals $6,350,000.[15] (Plaintiffs' Brief in Support - Exhibit 9). Richard Hunt sent a letter to James Zwiers on November 4, 2005 in which he stated "[i]t is understood that the actual shipping made against the Customer Purchase Orders were $6,350,000 although no supporting documentation was presented with your letter."

---

[15] Plaintiffs also cite page 68 of David Coughlin's deposition. Mr. Coughlin does not discuss the value of the orders shipped on page 68. Paragraph 10 of Mr. Coughlin's affidavit does indicate the "shipments against customer purchase orders amounted to $6,350,000 CDN." (Plaintiffs' Brief in Support - Exhibit 6 - Coughlin Affidavit.)

(Plaintiffs' Brief in Support - Exhibit 10 - Hunt Letter.)  At his deposition, Mr. Hunt confirmed he had since "seen spreadsheets that indicate that that is what they actually shipped" and that he did not have any documentation to the contrary.  (Plaintiffs' Brief in Support - Exhibit 1 - Hunt Dep. at 152.)  Although the warehouse experienced "growing pains" (Coughlin Dep. at 111), Dennis Robinson testified, to his knowledge, all the shipments contained in WCI's books were complete by the end of June (Robinson Dep. at 128-129.[16])  (*See also* Coughlin Dep. at 113; Paikin Dep. at 19.)

As described in the previous discussion of this issue in Defendants' motion, Defendants contend Plaintiffs' evidence is insufficient.  David Coughlin testified that no one at Wolverine ever determined whether there were orders in WCI's order book that did not ship before June 30, 2005.  (Coughlin Dep. at 108.)  Based upon this statement, Defendants argue they are entitled to summary judgment because Plaintiffs cannot prove whether all the shipments have been properly calculated.

Plaintiffs are entitled to summary judgment on the shipping level issue.  Viewing the facts in a light most favorable to Defendants, Plaintiffs have established that, by the end of June 2005, the warehouse had shipped all the orders on WCI's books.  Plaintiffs have established the total amount of the shipments was $6,350,000.  Under the terms of the TAP, Plaintiffs are entitled to a reduction in the purchase price of $150,000.  Defendants evidence on this issue does not create a genuine issue

---

[16]

Plaintiffs' citations to this deposition in their response to Defendants' motion and their reply brief in support of their motion illustrates the problem that occurs when supplying different versions of a deposition transcript.  In both briefs, Plaintiffs cite the testimony as occurring on page 116 of the deposition.  In their response brief, Plaintiffs attach, as their exhibit, the version of the deposition created by a word processing program.  In their reply brief, Plaintiffs attach the more familiar form of the deposition testimony generated by a transcription service.  Mr. Robinson makes the statement on pages 128 and 129 of the transcription service form of his deposition, and on page 116 of the word processing form of the deposition.  Plaintiffs, however, include page 116 of the transcription service form of his deposition in their reply brief. Nothing on that page supports Plaintiffs' claim.

of material fact. At best, Defendants' evidence on this point, Mr. Coughlin's statement on page 108 of his deposition, attests to a lack of affirmative evidence, specifically, that no one has reviewed the books to determine whether any shipments were delayed beyond June 30. Plaintiffs' offer Mr. Hunt's statement for the same proposition, but on the other side of the issue. Mr. Hunt was unaware of any evidence confirming that shipments were delayed. These two statements attesting to the lack of affirmative evidence must be viewed along with the statements of Mr. Coughlin, Mr. Robinson, and Mr. Paikin that they were unaware of any orders in WCI's order book that were supposed to be shipped before June 30, but were delayed. Taken together, Defendants have not created a genuine issue of material fact. *See Tucker*, 539 F.3d at 531 ("[w]hile all inferences are drawn in favor of the non-moving party, that party must still present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment (citing *Browning v. Dep't of Army*, 436 F.3d 692, 695 (6th Cir. 2006)).

### 3. Returns, Credits and Deductions

Plaintiffs argue Defendants are liable for products sold by Defendants prior to January 4, 2005 and later returned. Plaintiffs concede there are factual issues that will need to be resolved at trial "with regard to the precise amounts of returns and credits allocable to WCI's sales of footwear." (Plaintiffs' Brief in Support at 12 n. 5.) Rather than contesting the issue of liability, Defendants respond by asserting facts related to specific amounts for which they would be liable. Defendants assert they are not liable for any markdowns provided that are inconsistent with its past practice. Defendants argue they are not liable for the amounts identified in various debit notes because Plaintiffs have not established the footwear was sold before January 4, 2005.

Plaintiffs are entitled to summary judgment on the limited issue of whether Defendants are

liable, under the TAP, for products sold prior to January 4, 2005. Plaintiffs will have to establish at trial whether any particular claim falls under the parameters and criteria outlined in the TAP. As explained under the discussion of Defendants' motion for summary judgment, under section 9(f) of the TAP, WCI is financially responsible for footwear sold on or before January 4, 2005. Richard Hunt confirmed this was his understanding of the TAP. (Hunt Dep. at 88-90.)

Plaintiffs are not entitled to summary judgment on the debit notes from Mark's Work Warehouse dated January 2005. (*See* Plaintiffs' Reply - Exhibit F - January Debit Notes.) Plaintiffs' motion did not request summary judgment on these debit notes. In Defendants' response, they simply acknowledge Plaintiffs' conceded there were factual issues to be resolved at trial. (Defendants' Response at 10.) Defendants did not address these debit notes in their motion for summary judgment. In Plaintiffs' reply brief, they argue they are entitled to summary judgment on these debit notes because the sales and returns would have necessarily occurred prior to January 4, 2005. Although Plaintiffs' reasoning is persuasive, Defendants have not had an opportunity to respond to this narrow issue. Accordingly summary judgment is not appropriate. *See ABC Beverage Corp. & Subsidiaries v. United States*, 577 F.Supp.2d 935, 950 n. 16 (W.D. Mich. 2008) (Maloney, J.) (holding summary judgment is not appropriate when the issue is raised for the first time in a reply brief because the other side has no opportunity to respond).

Plaintiffs request summary judgment on the issue of the markdowns for Scion and Bolton footwear. This issue is properly before the Court for summary judgment. Defendants briefed the issue in their motion for summary judgment. Defendants also developed their claims on this issue in their response to Plaintiffs' motion. (*See* Defendants' Response at 8-9.) Plaintiffs request summary judgment on this issue in their reply brief based on the arguments and evidence supplied

33

by both parties. (Plaintiffs' Reply at 3 n. 1.) As explained in the earlier discussion of this issue, under section 9(f) of the TAP, Plaintiffs had discretion to grant credit adjustments to customers under either of two contingencies.

Under Michigan law, the proper interpretation of a contract is a question of law. *JP Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007) (citing *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402, 646 N.W.2d 170, 174 (2002)). *See also Bandit Indust., Inc. v. Hobbs Int'l, Inc.*, 463 Mich. 504, 511, 620 N.W.2d 531 (2001) (citing *Morley v. Auto. Club of Michigan*, 458 Mich. 459, 465, 581 N.W.2d 237 (1998)). When interpreting a contract, courts primary obligation is to determine the intent of the parties. *Quality Prods and Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375, 666 N.W.2d 251 (2003) (citing *Sobczak v. Kotwicki*, 347 Mich. 242, 249, 79 N.W.2d 471 (1956)). The question of whether a contract provision is clear or ambiguous is a question of law. *Port Huron Ed. Ass'n v. Port Huron Area Sch. Dist.*, 452 Mich 309, 323, 550 N.W.2d 228 (1996). If the contract provision is unambiguous, it reflects the parties' intent as a matter of law and will be enforced as written. *Quality Prods.*, 666 N.W.2d at 259.

Viewing the facts in a light most favorable to Defendants, Plaintiffs are not entitled to summary judgment on the markdown issue. The portion of the contract at issue here, part of section 9(f), is not ambiguous. The provision identifies two possible contingencies and then gives Plaintiffs the authority to give the customer an accommodation under either contingency. There are genuine issues of material fact whether either of the two contingencies ever occurred. Plaintiffs have not established that Defendants, as the Seller under the TAP, did not handle the return in a manner that is fair to the customer and consistent with their past practice. The record is unclear whether Defendants handled the return at all or whether Plaintiffs handled the returns from Marks. (*See*

Paikin Dep. at 133; Robinson Dep. at 171.) Neither have Plaintiffs established the customer took or was due credits relating to products received on or before the date of the TAP against accounts receivable. Absent either of the two contingencies occurring, Plaintiff has not established they had the authority to grant the retailer an accommodation.

4. Responsibility for the Confines Footwear

Plaintiffs seek summary judgment of Defendants' first counter-claim. Plaintiffs argue they cannot be held responsible for the defects in the Confines footwear based upon section 7.2 of the distribution agreement. Plaintiffs also argue they cannot be held liable for the defects under section 19.5 of the distribution agreement. Defendants argue the liability disclaimer does not waive liability for Wolverine's duty to inspect. Defendants argue the liability disclaimer is ambiguous. Defendants argue Wolverine is liable under the distribution agreement because the distribution agreement falls under the UCC.[17] Finally, Defendants argue Wolverine fraudulently induced them to sign the TAP and therefore Plaintiffs are not entitled to summary judgment on the first counter-claim. With the exception of the fraud claim, these arguments were discussed above under Defendants' motion for summary judgment.

Contrary to Plaintiffs' assertions, under section 7.2, Wolverine assumed the duty to inspect products shipped by their authorized manufacturers. The provision is clear, unambiguous and succinct. "Wolverine will perform quality control inspections before shipment of Products and will approve or disapprove Products pursuant to established quality control standards of Wolverine and Caterpillar." (Distribution Agreement § 7.2.) This sentence does not reserve the right to perform

---

[17] This argument was resolved against Defendants as a matter of law on Defendants' motion for summary judgment.

quality control checks, but obligates Plaintiff to inspect the goods.

The issue of the liability disclaimer is rather simple and straightforward. Plaintiffs disclaimed any liability "for an Authorized Manufacturer's performance or nonperformance." (Distribution Agreement ¶ 19.5.) The words "performance" and "nonperformance" are not ambiguous. Black's Law Dictionary defines "performance" as "the successful completion of a contractual duty" (8th ed. 2004 at 1173) and "nonperformance" as "failure to discharge an obligation (esp. a contractual one)" (*Id.* at 1082). When read in context of the paragraph, Plaintiffs disclaimed any liability for the manufacturer's failure to fulfill the manufacturers' contractual obligations. Through paragraph 19.5, Plaintiffs did not disclaim any liability for failure to inspect.

Plaintiffs are entitled to summary judgment on Defendants' claim that Plaintiffs breached their duty to inspect. In addition to the evidence outlined under this issue in Defendants' motion for summary judgment, Plaintiffs submitted, as part of their reply brief, an affidavit by John Burch. (Plaintiffs' Reply - Exhibit J - Burch Dep.) Mr. Burch avers that spot checks were performed on the Confines footwear at issue and that the checks could not have detected any of the latent defects. (*Id.* ¶ 8.) This evidence is consistent with the evidence presented in Defendants' motion. Viewing these facts in a light most favorable to Defendants, the facts establish Plaintiffs did not breach their duty to inspect. The fact that the boots had latent defects is not dispositive of the separate issue of whether the inspections performed were adequate.

Defendants assert they cannot be held liable for the Confines footwear because they were fraudulently induced to sign the TAP Agreement. Plaintiffs argue Defendants cannot establish a claim for fraud, and the integration or merger clause in the TAP undermines Defendants' argument. The Court approaches this issue taking the facts in a light most favorable to Defendants. This Court

assumes Richard Hunt asked that the issue of the defective Confines be included in the TAP Agreement. (Hunt Dec. ¶ 32.) This Court also assumes James Zwiers assured Mr. Hunt that the defective Confines were a separate issue that did not need to be dealt with under the TAP. (*Id.* ¶ 33.)

The intersection of the parol evidence rule, integration clauses, and fraudulent inducement has been outlined in some detail by the Michigan Court of Appeals. *See Hamade v. Sunoco, Inc.*, 271 Mich. App. 145, 721 N.W.2d 233 (2006); *UAW-GM Human Res. Ctr v. KSL Recreational Corp.*, 228 Mich. App. 486, 579 N.W.2d 411 (1998). *See also Partner & Partner v. ExxonMobil Oil Corp.*, No. 08-1590, 2009 WL 1184796 (6th Cir. 2009). Generally, parol evidence of contract negotiations of prior or contemporaneous agreements are not admissible to vary the terms of a contract which is clear and unambiguous. *Hamade*, 721 N.W.2d at 247 (quoting *UAW-GM*, 579 N.W.2d at 414 (quoting *Schmude Oil Co. v. Omar Operating Co.*, 184 Mich. App. 274, 580, 458 N.W.2d 659 (1990))). Parol evidence is admissible on the threshold question of whether a written contract is an integrated instrument that is a complete expression of the agreement reached by the parties. *UAW-GM*, 579 N.W.2d at 414 (citing *In re Skotzke Estate*, 216 Mich. App. 247, 251-252, 548 N.W.2d 695 (1996) and *NAG Enters., Inc. v. All State Indust., Inc.*, 407 Mich. 407, 410-411, 285 N.W.2d 770 (1979)). Parol evidence is thus admissible to show (1) the writing was not intended to create a legal relationship, (2) the contract has no effect due to fraud, illegality or mistake, (3) the parties did not integrate their agreement or (4) the agreement was only partially integrated. *Id.* (citing *NAG*, 285 N.W.2d at 771-772). When the contract contains an explicit integration or merger clause, parol evidence is not admissible to determine whether the contract is integrated. *Id.* at 415, 416. In both *UAW-GM* and *Hamade*, the majority held, when a contract contains an explicit integration clause, parol evidence is admissible to show that the fraud alleged invalidates the

integration clause itself, and therefore the entire contract. 721 N.W. at 248-249; 579 N.W.2d at 418-419. *See Partner & Partner*, 2009 WL 1184796 at *3 ("When the parties include an explicit integration or merger clause in a written contract, that clause is conclusive and parol evidence is not admissible to show that the agreement is not integrated unless the agreement is obviously incomplete on its face, . . . , or in cases of fraud that invalidates either the integration clause or the entire contract including the integration clause" (citing *UAW-GM*, 579 N.W.2d at 418)).

Defendants argument here does not create a genuine issue of material fact on the validity of the TAP Agreement or on whether Defendants are liable for the defects in the Confines footwear.[18] The TAP contains an integration clause. (TAP at § 15(b).) Richard Hunt was aware the TAP did not contain a clause resolving who was liable for the Confines footwear. (Hunt Dec. ¶¶ 37 and 38.) Instead, Mr. Hunt elected to rely on Mr. Zwiers' representations that the defective Confines problem would be taken care of by Wolverine. (*Id.* ¶ 37.) Therefore, Mr. Hunt was not led to believe the TAP resolved the problems related to the defective Confines. *See Hamade*, 721 N.W.2d at 249 ("Plaintiff does not contend that he was misled into believing the 1997 Agreement contained a clause granting him an exclusive territory when in fact it did not"); *UAW-GM*, 579 N.W. at 420 ("there is no allegation that he was defrauded regarding the integration clause or defrauded into believing that

---

    18

How this argument factors into the claims advanced in the two motions is not entirely clear. Defendants did not move for summary judgment on the issue of fraud. Defendants raise the issue in their response brief to Plaintiffs' motion in an attempt to undermine Plaintiffs' attempt to eliminate Defendant's first counter-claim. Defendants' first counter-claim raises a breach of the distribution agreement. Whether Defendants were fraudulently induced into entering the TAP would appear to be a separate issue from whether Plaintiffs' breached the distribution agreement. If Defendants were to prevail on their fraudulent inducement argument, the TAP becomes voidable. *See UAW-GM*, 579 N.W. at 418 (citing 3 Corbin, Contracts § 580). Such an outcome would not implicate either parties' responsibilities under the distribution agreement.

the written contract included a provision requiring the hotel to use union-represented employees when it did not"). The integration clause makes Mr. Hunt's reliance on Mr. Zwiers' alleged representations unreasonable. *See Id.* at 419 ("the merger clause made it unreasonable for plaintiff's agent to rely on any representations not included in the letter of agreement").

## IV. CONCLUSION

For the reasons provided above, Plaintiffs' motion for leave to file a sur-reply is GRANTED. Plaintiffs' response and reply brief were timely filed. Defendants' motion for summary judgment is DENIED. Plaintiffs' motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.

## ORDER

For the reasons provided in the accompanying opinion, **IT IS HEREBY ORDERED:**

1. Plaintiffs' motion (Dkt. No. 103) for leave to file sur-reply is **GRANTED.**

2. Defendants' motion (Dkt. No. 90) for summary judgment is **DENIED.**

3. Plaintiffs' motion (Dkt. No. 91) for partial summary judgment is **GRANTED IN PART and DENIED IN PART.**

Date:___August 21, 2009___                              ___/s/ Paul L. Maloney___
                                                        Paul L. Maloney
                                                        Chief, United States District Judge